IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DANIEL T. HEILNER,<br><br>Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>Defendant. | MEMORANDUM DECISION & ORDER<br><br>Case No: 2:04-CV-669 DN<br><br>Magistrate Judge David Nuffer |

Plaintiff Daniel T. Heilner seeks judicial review of the Commissioner's decision denying his claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.[1]  This case was referred to the Magistrate Judge, with the consent of the parties, to conduct all proceedings pursuant to 28 U.S.C. § 636(c).

**Procedural History**

Heilner filed applications for DIB and SSI in October 2001, alleging an inability to work since November 20, 1999[2] due to psychiatric problems.[3]  His applications were denied in initial and reconsidered determinations.[4]  Heilner then requested a hearing before the Administrative

---

[1] 42 U.S.C. §§ 401-433, 1381-1383F.

[2] R. 63-65, 300-03.

[3] R. 104.

[4] R. 41-43, 47-50.

Law Judge (ALJ),[5] and appeared at the scheduled hearing on December 17, 2002.[6]

Subsequently, on May 1, 2003, the ALJ issued a decision finding Heilner was not disabled

because he could perform jobs existing in significant numbers in the national economy.[7]  Heilner

filed a request for review of the ALJ's decision by the Appeals Council,[8] which was denied on

May 17, 2004.[9]  Thereafter, the ALJ's decision became the Commissioner's final decision under

42 U.S.C. § 405(g).[10]

### Summary of Heilner's Background and Medical Evidence in the Record

Heilner was born on March 25, 1976.  He was twenty-three years old at the alleged onset

date of November 20, 1999,[11] and twenty-seven years old at the time the ALJ's decision issued

on May 1, 2003.[12]  Heilner's psychiatric problems began to manifest early in his life.  In early

elementary school his teachers complained that he had an inability to focus and complete his

work.[13]  He was expelled from each of the four different high schools he attended.[14]

---

[5]R. 39.

[6]R. 313-55.

[7]R. 15-27.

[8]R. 10-11, 304-12.

[9]R. 6-8.

[10]*See* 20 C.F.R. §§ 404.981, 416.1481.

[11]R. 63.

[12]R. 27.

[13]R. 70.

[14]R. 71.

Consequently, he did not graduate from high school, but did get his GED.[15]  He has been unsuccessful in his attempts to complete any college or vocational education, having enrolled in at least six different schools.[16]  Heilner's attempts at long-term employment have also been unsuccessful.[17]  He has not been able to consistently work or attend school for more than five months at a time.[18]

As Heilner's psychological problems began to manifest and escalate in elementary school, teachers and school administrators encouraged his mother to have him tested.[19]  *In August 1987, Pim Brouwers, Ph.D. and Ida Sue Baron, Ph.D., evaluated Heilner, then eleven years old, to assess* his strengths and weaknesses in intellectual, cognitive, and neuropsychological functioning.[20]  Testing revealed that attention and concentration were clear areas of difficulty for Heilner, especially in a classroom setting.[21]  Subsequently, Heilner was treated by William Louis Licamele, M.D. from January 1988 until 1990.[22]  Dr. Licamele diagnosed Heilner with Attention Deficit Hyperactivity Disorder (ADHD) and treated him with Ritalin and psychotherapy.[23]  Dr.

---

[15] *Id.*

[16] R. 72.

[17] R. 70-72.

[18] R. 72.

[19] R. 70.

[20] R. 126-32.

[21] R. 131-32.

[22] R. 133, 248.

[23] *Id.*

Licamele also noted that Heilner's trials off medication resulted in extreme attention and academic problems.[24]  Dr. Licamele added that Heilner may have depression and bipolar illness due to positive family history for manic depressive disorder.[25]

In November 1993, John Helfer, M.D., a staff psychiatrist at the Charter Provo Canyon School diagnosed Heilner with bipolar disorder and treated him with Eskalith to maintain his mental health.[26]  In April 1994, Dr. Helfer stated he was sending a supply of medication for Heilner because he would be overseas for an extended period of time.  Dr. Helfer recommended that Heilner continue taking his medication while he was abroad[27] attending college in Madrid, Spain.[28]  However, Heilner was unable to keep up with his classwork, and dropped out of school.[29]  At some point he became completely disoriented, and the police found him in the street in a delusional and incoherent state.[30]  They transported Heilner to a psychiatric hospital in Madrid, where he remained in lockdown treatment for approximately three weeks before he was able to contact anyone in the United States about his situation.[31]  Eventually, Heilner's mother had to fly to Spain to escort him home.[32]

---

[24]R. 248.

[25]*Id.*

[26]R. 134.

[27]*Id.*

[28]R. 70.

[29]*Id.*

[30]*Id.*

[31]R. 70-71.

[32]R. 71.

Upon his return from Spain in July 1995, Heilner was immediately hospitalized at University Neuropsychiatric Institute (UNI) in Salt Lake City and began treatment with psychiatrist Lowry A. Bushnell, M..D.[33]   Dr. Bushnell continued to treat Heilner for bipolar affective disorder through, at least, January 2004.[34]

Medical records indicate that from 1996 through 2002, Heilner was admitted to the hospital and/or emergency room on several occasions.  In January 1996, Heilner was brought into the LDS Hospital emergency room, handcuffed to the gurney, by Emergency Medical Services (EMS) and the Salt Lake City police.[35]  He was screaming, combative and disoriented.[36] After a  toxicology screen was positive for benzodiazepines and amphetamines, Heilner was admitted into the hospital for post drug intoxication, altered mental status, and a psychiatric consult.[37]  After a three-day hospital stay, Heilner was discharged in the care of his mother, to be transported directly to UNI for inpatient admission.[38]  Records from UNI for this stay are not included in the record, but the admission and stay at UNI is confirmed by Dr. Bushnell's treatment notes.[39]  Dr. Bushnell also records another inpatient hospitalization for Heilner at UNI

[33]*Id.;* R. 307.

[34]R. 144-71. 252-66, 290-93, 295-300, 307.

[35]R. 137; 140.

[36]R. 140.

[37]R.135-41.

[38]R.136.

[39]R. 168.

in February 1996.[40]  Dr. Bushnell saw Heilner again in March and then in April when Heilner was hospitalized.[41]  Heilner was told to return within a month.[42]

In December 1998, Heilner was admitted to the hospital because of delusional, psychotic, and intermittent suicidal ideation.[43]  A toxicology screen was negative.[44]  Heilner reported that he needed to fine tune his medications.[45]  After a three-day hospitalization, Heilner was diagnosed as having a hypomanic episode of bi-polar affective disorder and was restarted on a series of psychotic medications.[46]  The discharge order also indicates that Heilner was to be discharged to another facility,[47] but records confirming that are not included with the record.

In March 2000, Heilner presented to an emergency room with complaints of nausea, vomiting, diarrhea, and dehydration after drinking wine.[48]  His blood alcohol level was 0.01% and a toxicology screen was negative for cocaine, opiates, THC, amphetamines, benzodiazepines, barbiturates, and Methadone.[49]  Charles M. Ayers, M.D., suspected that

---

[40]*Id.*

[41]R. 167.

[42]*Id.*  The ALJ misread this note and found that Bushnell urged Heilner "to refrain from using 'meth.'" R. 17.

[43]R. 173.

[44]*Id.*

[45]*Id.*

[46]R. 172.

[47]*Id.*

[48]R. 179, 181.

[49]R. 182.

Heilner's symptoms were caused by mixing bipolar medications with alcohol.[50]  After conferring

with his treating psychiatrist, Dr. Ayers discharged Heilner to his mother's care later that day.

In April 2000, Heilner went to an emergency room complaining of mild nausea,

shaking, and anxiety after eating a "brownie laced with some sort of drug."[51]  On examination, he

demonstrated no psychotic or suicidal symptoms but his reasoning was limited.[52]  His Depakote

level was low.[53]  Heilner was discharged, but told to follow up with is primary physician, Dr.

Bushnell, for adjustment to the low level in his medication.[54]

In May 2000, Heilner presented to an emergency room for bizarre behavior after

returning from a weekend trip from California.[55]  He was diagnosed with drug induced

psychosis,[56] and was discharged later that day.

In December 2000, Heilner went to an emergency room because of nausea,

abdominal pain, and vomiting.[57]  Heilner indicated that although he normally does not drink,  he

had some alcohol to drink the previous night.[58]  The attending physician suspected that Heilner's

---

[50]*Id.*

[51]R. 193.

[52]*Id.*

[53]R. 194.

[54]*Id.*

[55]R.185-86.

[56]R. 187.

[57]R. 190.

[58]*Id.*

symptoms were related to food intake.[59]  Later that day, Heilner was discharged in stable and improved condition.[60]

On January 12, 2001, Plaintiff presented to an emergency room for complaints of nausea and vomiting after drinking alcohol the night before.[61]  He was hydrated and discharged.  Two weeks later, on January 28, 2001, Heilner went to the emergency room due to acute vomiting after drinking the previous night.[62]  Once again, he was hydrated, counseled not to drink in excess and released.[63]

In February 2001, Heilner presented to an emergency room for complaints of nausea, abdominal cramping, and vomiting after eating some "bad crab cakes" the previous afternoon.[64] After an examination, Heilner  refused intravenous treatment, reported he was feeling better and was discharged to return home.[65]

On March 16, 2001, Heilner went to an emergency room complaining of severe abdominal pain and vomiting after eating a "potato pasta dish."[66] After being hydrated with intravenous fluids, he was discharged in stable condition.[67]

---

[59]R. 191.

[60]*Id.*

[61]R. 238-39.

[62]R. 236-37.

[63]R. 237.

[64]R. 201.

[65]*Id.*

[66]R. 195.

[67]R. 196.

On March 21, 2001, paramedics brought Heilner to the emergency room in an unresponsive state.[68]  His toxicology screen was negative.[69]  Heilner  was diagnosed with decreased level of consciousness, status epilepticus, respiratory failure, and aspiration pneumonia.[70]  A doctor from the neurology service was called in for an assessment.  He determined that Heilner needed to be admitted for acute neurocritical care hospitalization.[71]  After being stabilized and completing a series of radiology tests, Heilner was discharged.[72]

On May 8, 2001, Heilner went to an emergency room complaining of nausea, vomiting, and a mild headache.[73]  He reported that he had been drinking beer the night before.[74]  The attending physician diagnosed him with alcoholic gastritis and treated him with intravenous medication.[75]  He was discharged a few hours later.[76]

In late May or early June, 2001,[77] Heilner reported to an emergency room complaining he was having a  "psychotic break."[78]  He complained of hearing and seeing things, nightmares, and

---

[68]R. 214-33.

[69]R. 215.

[70]R. 215.

[71]*Id.*

[72]R. 224-33.

[73]R. 208-13.

[74]*Id.*

[75]R. 209

[76]R. 213.

[77]R. 234-35.  The ER Report is dated 05/29/01and 06/03/01.

[78]*Id.*

excessive religiosity and guilt.[79]  The doctor noted that, in addition to his regular antipsychotic

medications (Depakote, Navane, and Tegretol), Heilner was using a new antipsychotic drug

called Giodon, that "apparently was not working."[80]  After completing an evaluation with a

psychiatric social worker, Heilner began to calm down.[81]  He was discharged after the crisis

worker arranged for him to see his private therapist the next day.[82]

        In March 2002, Heilner was admitted to an emergency room complaining of nausea and

vomiting after drinking some champagne and eating guacamole.[83]  He was treated with

intravenous fluids and Benadryl and discharged an hour later.[84]

        In addition to these records for hospitalizations, the record contains treatment notes from

Dr. Bushnell, Heilner's treating psychiatrist of nine years.[85]  Before the hearing, Dr. Bushnell

completed a mental assessment on Heilner describing his condition as very "brittle,"[86] stating that

he continually "decompensates to manic or depression under the stress of work or significant

social interactions."[87]  Dr. Bushnell's assessment found that Heilner was disabled because he met

---

[79]*Id.*

[80]R. 234.

[81]R. 235.

[82]*Id.*

[83]R. 250-51.

[84]R. 251.

[85]Treatment notes contained in the record are for periods 10/4/95-12/17/98, exhibit 6F, R. 144-71; 12/23/99- 10/3/01, exhibit 17F, R. 253 - 66; 1/10/02 - 12/9/02, exhibit 20F, R. 291-93; 6/19/02, exhibit 19F, R. 290.

[86]R. 296.

[87]R. 300.

the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P., app.1.[88]  In a post hearing letter dated

January 9, 2004, Dr. Bushnell again described Heilner's mental condition and explained that,

although compliant with medications, the treatment record demonstrates that Heilner still "cycles

into mania with episodes of psychosis."[89]  Dr. Bushnell went on to explain that although Heilner

has abused drugs and alcohol in the past, his bipolar disease was always clearly primary and

there was "no evidence the substances cause his mania."[90]

On January 11, 2002, Merritt H. Egan, M.D., a nonexamining State agency physician,

reviewed the file evidence and concluded that Heilner could not perform activities within a

schedule, maintain a regular attendance or be punctual within customary tolerances.[91]  Further,

Dr. Egan stated that Heilner could not complete a normal workweek without interruptions from

psychological symptoms and that he could not set realistic goals or make plans independent of

others.[92]  At that time, Dr. Egan also opined that drug and alcohol addiction were material to his

disability.[93]  On April 24, 2002, John Gill, Ph.D., a nonexamining State agency physician,

affirmed Dr. Egan's findings.[94]

At the administrative hearing, Thomas Edward Atkin, Psy.D., testified as a medical

---

[88]Exhibit 21F, R. 295-300.

[89]Exhibit AC-2, R. 307

[90]*Id.*

[91]R. 286.

[92]*Id.*

[93]*Id.*

[94]R. 287.

expert.[95]  Dr. Atkin opined that Heilner's alcohol and substance abuse was a contributing

material factor to disability from the alleged onset of disability of November 1999 through

January 1, 2001, but that alcohol and substance abuse was not a contributing material factor to

disability after January 2001.[96]  Dr. Atkin opined that since 2001, Plaintiff had mild restriction of

activities of daily living, moderate difficulties in maintaining social functioning, moderate

difficulties in maintaining concentration, persistence or pace, and one or two episodes of

decompensation, each of extended duration.[97]  Dr. Atkin thought that Heilner was capable of

handling low stress work with minimal contact with the public and limited contact with co-

workers.[98]

### The ALJ's Decision

The ALJ found that from the alleged onset date, Heilner suffered from medically

determinable severe impairments including "bipolar disorder, history of polysubstance abuse and

alcohol abuse in remission."[99]   However, the ALJ determined that through May 2001, substance

abuse was a contributing factor material to his disability, i.e., he was not disabled absent the

effects of his substance abuse.[100]   In making this determination, the ALJ discounted the opinion

---

[95]R. 339-48.

[96]R. 340-41.

[97]R. 341.

[98]R.344.

[99]R. 25.

[100]R. 26.

of Heilner's long-time treating physician, Dr. Bushnell.[101]  The ALJ felt that Dr. Bushnell's

opinion was inconsistent with his treatment notes and that it did not adequately consider alcohol

and drug abuse.[102]

  The ALJ concluded that Heilner retained the residual functional capacity to perform low

stress work, repetitive work activities with minimal contact with workers and the general

public.[103]  Although he could not perform his past relevant work, the ALJ concluded that Heilner

could perform other work existing in significant numbers in the national economy, and therefore,

he was not disabled .[104]

### Analysis

  The ALJ must evaluate all medical opinions in the record.  However, the weight given

each opinion will vary according to the relationship between the claimant and the medical

professional.[105]  "The opinion of an examining physician is generally entitled to less weight than

that of a treating physician, and the opinion of an agency physician who has never seen the

claimant is entitled to the least weight of all."[106]

  The ALJ is required to give controlling weight to the opinion of the treating physician so

long as it is well-supported by medically acceptable clinical and laboratory diagnostic

---

[101]*Id.*

[102]*Id.*

[103]*Id.*

[104]R. 26-27.

[105]*Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004).

[106]*Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004); 20 C.F.R. § 404.1527(d)(1).

techniques, and is not inconsistent with other substantial evidence in the record.[107]  "An ALJ may

disregard a treating physician's opinion, however, if it is not so supported."[108]  In all cases, the

regulations require that the ALJ "give good reasons" in his decision for the weight that he gave

to the treating physician's opinion.[109]

Heilner contends that the ALJ failed to give Dr. Bushnell's opinion the controlling

weight to which it was entitled.

> The treating physician's opinion is given particular weight because
> of his "unique perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from reports
> of individual examinations, such as consultative examinations or
> brief hospitalizations." 20 C.F.R. § 416.927(d)(2).  This requires a
> relationship of both duration and frequency. "The treating
> physician doctrine is based on the assumption that a medical
> professional *who has dealt with a claimant and his maladies over a
> long period of time* will have a deeper insight into the medical
> condition of the claimant than will a person who has examined a
> claimant but once, or who has only seen the claimant's medical
> records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir.1994)
> (emphasis added). . . . Moreover, a longstanding treatment
> relationship provides some assurance that the opinion has been
> formed for purposes of treatment and not simply to facilitate the
> obtaining of benefits.[110]

In this case, the ALJ refused to give controlling weight to the opinion of the treating

physician, Dr. Bushnell, "because it did not consider the claimant's alcohol and drug abuse, it is

out of proportion with the objective medical record, is inconsistent with Dr. Bushnell's treatment

---

[107]*Hamlin*, 365 F.3d at 1215 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).

[108]*Doyal*, 331 F.3d at 762; *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994).

[109]*Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215; *Drapeau v. Massanari*, 255 F. 3d 1211, 1213 (10th Cir. 2001)
(requiring the ALJ to supply "specific, legitimate reasons" for rejecting the opinion of the treating physician).

[110]*Doyal*, 331 F.3d at 762-63.

notes, and is on issues ultimately reserved to the Commissioner."[111]  Yet this finding is not supported by the record evidence or the ALJ's own "Evaluation of the Evidence" contained in his opinion.[112]

First, Dr. Bushnell's treatment notes contain several references to Heilner's drug and alcohol abuse.[113]  Additionally, the Mental Status Report that Dr. Bushnell completed on April 30, 1996, documents a history of drug and alcohol abuse.[114]  By the time Dr. Bushnell completed The Mental Impairment Questionnaire (RFC & Listings) on December 16, 2002, the record is clear that Heilner's abuse was in remission for well over a year.[115]  Dr. Bushnell's treatment notes and documentation fully considered Heilner's drug and alcohol abuse, and **found it to be a symptom of his mental illness, not the cause**.[116]  This important finding was ignored by the ALJ.

Next, Dr. Bushnell's opinion is not out of proportion with the medical record.  Consistent with Dr. Bushnell's opinion, the nonexamining State agency physicians also concluded that Heilner could not perform activities within a schedule, maintain a regular attendance or be punctual within customary tolerances, could not complete a normal workweek without interruptions from psychological symptoms and that he could not set realistic goals or make

---

[111]R. 26.

[112]*See* R. 16-25.

[113]*See* R. 160-66; 168; 258; 262-64.

[114]R. 160-66.

[115]*See* R. 340-41 (Dr. Atkins's testimony stating abuse in remission since January 2001); R. 26 (ALJ's finding that abuse in remissions since May 2001).

[116]R. 307-08.

plans independent of others..[117]

The ALJ also concluded that Dr. Bushnell's opinion was inconsistent with his treatment notes.  However, Dr. Bushnell's treatment notes contained in the record, clearly show the repeated, ongoing cyclical phases of Heilner's mental illness, ranging from manic to euthymic. Moreover, the inconsistency might be explained by gaps in the treatment notes that are not contained in the record.[118]  Further, if the ALJ believed that Dr. Bushnell's reported opinion and treatment notes were in conflict, he had the obligation under the regulations[119] to obtain additional information from Dr. Bushnell before rejecting the report.[120]

Finally, it does not appear that the ALJ considered several other specific factors[121] in disregarding the treating physician's opinion, including: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; and (3) whether or not the physician is a specialist in the area upon which an opinion is rendered.[122]  In this case, Dr. Bushnell was Heilner's treating physician since 1995, treating him daily during hospitalizations, seeing him on emergency basis when necessary, and

---

[117]R. 286.

[118]See supra note 83.

[119]See 20 C.F.R. § 404.1512(e)(1) stating:
> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

[120]McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002).

[121]See Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting Goatcher v. United States Dep't of Health & Human Servs., 52 F.3d 288, 290 10th Cir. 1995) (providing a list of specific factors ALJ must consider).

[122]See id.

meeting with him on a regular basis throughout the treatment period.  The nature of the treatment was very personal, as Dr. Bushnell was providing psychiatric treatment for a mental illness on an ongoing basis.  Lastly, as a psychiatrist, Dr. Bushnell is a specialist in the area in which he rendered an opinion.

In light of all these reasons discussed, the ALJ should not have dismissed the opinion of the long-term treating physician to rely completely on the opinion of the medical expert Dr. Atkin, a nonexamining, nontreating clinical psychologist.  The Tenth Circuit has continually cautioned against such reliance by stating that the "findings of a nontreating physician based upon limited contact and examination are of suspect reliability."[123]

### Conclusion

Because the ALJ failed to follow the applicable legal standards when evaluating the opinion of the treating physician, his conclusions regarding the treating physician's opinion were not supported by substantial evidence.  Accordingly, the case is reversed and remanded to the ALJ for further proceedings.

### ORDER

IT IS HEREBY ORDERED that the case is REVERSED and REMANDED for proper consideration of the treating physician's report and opinion.

---

[123]*See McGoffin*, 288 F.3d at 1253 (quoting *Frey v. Bowen*, 816 F.2d 508, 515); *Drapeau*, 255 F.3d at 1214 (same).

DATED this 13th  day of September, 2006.


                    BY THE COURT:


                    _____
                    David Nuffer
                    U.S. Magistrate Judge